UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK P. C.. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 796 JMB |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an unfavorable ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On October 11, 2017, plaintiff Frank C. filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et* seq., with an alleged onset date of September 27, 2016.[2] (Tr. 149, 231-34).  After plaintiff's application was denied on initial consideration (Tr. 149-63), he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 172-74).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021, and accordingly has been substituted Andrew Saul as the defendant in this suit.  Rule 25(d), Fed.R.Civ.P.

[2] This was the third time plaintiff applied for disability benefits.  He first applied under Titles II and XVI in October 2010.  An ALJ issued an unfavorable decision in September 2012 and the Appeals Council denied review in March 2014.  (Tr. 90-99, 48).  He applied a second time in July 2014.  An ALJ issued an unfavorable decision in September 2016 and the Appeals Council denied review on September 8, 2017. (Tr. 117-38, 150).  Plaintiff's inured status expired on December 31, 2014.  (Tr. 119).

Plaintiff and counsel appeared for a hearing on May 6, 2019. (Tr. 68-86). Plaintiff testified concerning his disability, daily activities, and functional limitations. The ALJ also received testimony from vocational expert Terri Crawford, M.Ed. Plaintiff submitted additional records on June 13, 2019. (tr. 313). The ALJ issued a decision denying plaintiff's application on July 17, 2019. (Tr. 48-62). The Appeals Council denied plaintiff's request for review on May 5, 2020. (Tr. 39-43). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. 2012 ALJ Decision (Tr. 90-99)

The ALJ found that plaintiff had severe impairments of hypertension, major depressive disorder,[3] and attention deficit disorder. (Tr. 92). Plaintiff's sleep apnea and chronic pain syndrome caused no more than minimal limitations on his functioning and thus were not severe, while his claim that he experienced numbness in his hands was not confirmed by medical evidence. (Tr. 92-93). Plaintiff had mild restrictions in activities of daily living and social functioning; moderate restrictions in concentration, persistence, and pace; and no episodes of decompensation.[4] (Tr. 94). The ALJ found that plaintiff had the residual functional capacity (RFC) to perform medium work but was limited to simple jobs in a setting with only occasional changes in day-to-day routines. (Tr. 95-97). With this RFC, plaintiff was capable of performing his past relevant work as an auto assembler and thus was not disabled. (Tr. 98).

### B. 2016 ALJ Decision (Tr. 126-38)

---

[3] The ALJ noted that plaintiff did not have a treating mental health specialist but relied on his primary care physician, John A. Garcia, M.D., for his psychiatric medications. (Tr. 97).

[4] Plaintiff had been admitted to St. Anthony's Medical Center for psychiatric care but this admission did not satisfy regulatory requirements for episodes of decompensation of extended duration. (Tr. 93-94).

2

In 2016, the ALJ found that plaintiff had the severe impairments of major depressive disorder and anxiety.  The ALJ determined that plaintiff's complaints of back, shoulder, and knee pain did not result in functional limitations; and that his hypertension was controlled by medication.  Plaintiff claimed psychosis and paranoia as disabling conditions, but a medical expert testified that his experiences were more properly classified as anxious misperceptions.  Thus, the ALJ determined that these were nonsevere impairments.  (Tr. 119-21).  Plaintiff had mild restrictions in activities of daily living; and moderate restrictions in social functioning and in concentration, persistence, and pace; and no episodes of decompensation.  (Tr. 123).  The ALJ found that plaintiff had the RFC to perform a full range of work at all exertional levels but was limited to simple jobs in a low stress environment that required only occasional decision-making, occasional changes in the work setting, and limited contact with others.  (Tr. 124-36).  With this RFC, plaintiff was not capable of performing his past relevant work as a spray painter, but could work as a dishwasher, housekeeping cleaner, and hand packager, and thus was not disabled.  (Tr. 137-38).

### C.  Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in August 1970, was 46 years old on his alleged onset date.  (Tr. 242).  He left school after seventh grade and had not completed any specialized training or attended vocational school.  (Tr. 248).  Between 1995 and 2009, he worked as an auto sprayer.

Plaintiff claimed he was disabled due to bipolar disorder, COPD, hypertension, and heart disease.  (Tr. 247).  The medication list submitted with his application in October 2017 listed two inhalers and a nebulizer to treat COPD; carvedilol to treat heart failure; Norvasc and losartan to

treat high blood pressure; Ambien for insomnia; and Zoloft, aripiprazole, and lamotrigine[5] for mental disorders.  Although this list did not include pain medication, plaintiff was regularly prescribed Norco for chronic pain.  (Tr. 93, 991).  A Disability Report submitted on appeal in February 2018 stated that plaintiff was retaining fluid and had ulcers covering 75 percent of his esophagus and stomach.  (Tr. 284-90).  An updated medication list in May 2019 additionally listed a muscle relaxant and hydrocodone-acetaminophen for back pain and headaches, four medications to treat blood pressure, omeprazole to treat GERD, and duloxetine to treat depression and anxiety. (Tr. 310-12).

Plaintiff completed his November 2017 Function Report with his wife's help.  (Tr. 271-78).  Plaintiff stated that he was unable to work because walking and lifting caused shortness of breath and chest pain.  He felt anxious and paranoid when he was around a lot of people.  In response to a question asking which of his former activities he was no longer able to do, plaintiff listed working in the yard, taking out the trash, and working on cars.  (Tr. 272).  Elsewhere, however, he stated that he still was able to take out the trash and cut the grass, in addition to helping with laundry and picking up the house.  (Tr. 273).  He needed a lot of encouragement to complete these tasks, due to extreme depression.  He had insomnia, for which he took medication.  He was able to complete personal care without difficulty.  He could drive but did not go out alone because he was too anxious.  He went with his wife to the grocery store but waited in the car while she shopped.  He was able to manage financial accounts, although his wife wrote all the checks.  He described his daily activities as watching television and trying to do things around the house until

---

[5] Aripiprazole is used to treat symptoms of schizophrenia, episodes of mania or mixed episodes of bipolar disorder, or in combination with other medications to treat depression.  aripiprazole - medlineplus.gov (last visited Apr. 16, 2021).  Lamotrigine works by decreasing abnormal electrical activity in the brain and increases the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder.  lamotrigine - medlineplus.gov (last visited on Apr. 16, 2021).

he became short of breath.  He also felt extremely tired and slept a lot.  He occasionally played his guitar, but it hurt his chest to hold the guitar.  He visited his daughter and granddaughter, but otherwise did not go out much due to his anxiety.  He needed reminders to attend medical appointments.  Plaintiff had difficulties with lifting, walking, climbing stairs, and memory.  He could walk for a block before he needed to rest for 15 or 20 minutes.  He could pay attention for 30 minutes to an hour and was able to finish what he started.  He needed to have spoken instructions repeated but could follow written instructions pretty well.  He got along with everyone and had never lost a job because of difficulty getting along with others.  He did not handle stress or changes in routine well, and described himself as paranoid, depressed, and having crying spells.  His medications caused drowsiness.

Plaintiff's wife completed a third-party Function Report. (Tr. 259-66).  She explained that plaintiff did not go out alone and stayed home while she was at work.  She described plaintiff's daily activities as sleeping and watching television.  He was unmotivated to bathe more than once or twice a week and became short of breath while getting dressed, walking, climbing stairs, or lifting over 20 pounds.  He was able to pay attention for an hour or so and followed written instructions well, when he was able to focus.  In a narrative section, she wrote that, following heart surgery, he became short of breath or suffered chest pain if he lifted more than 20 pounds.

Plaintiff testified at the May 6, 2019, hearing that he suffered from depression and anxiety (Tr. 74-76), shortness of breath (Tr. 76-77), and pain in his back and knees (Tr. 79-80).  In addition, he had a heart attack in July 2017, following which he gained 71 pounds because his breathing problems prevented him from exercising.  Plaintiff stated that he did no household chores; indeed, he said he had not done "anything" since his heart attack but "sit on the couch" or "stare at the ceiling."  (Tr. 76-78).  He had edema and trouble urinating and was about to be tested for kidney

5

failure.  (Tr. 78-79).  His depression and anxiety kept him from interacting with others and he was

very dependent on his wife, who accompanied him to every medical appointment.  He had crying

spells between one and three times a week.  He thought people talked about him and put him down

and he had anger issues.  With respect to his breathing problems, plaintiff testified that he used a

nebulizer three times a day for 15 minutes at a time and his rescue inhaler 10 to 15 times a day,

rather than the three times a day that was prescribed.  Plaintiff had pain in his low back that radiated

into his left leg and made his foot numb.  (Tr. 79).  He had pain behind the knee joints that made

it difficult to stand.  (Tr. 80).

Vocational expert Terri Crawford testified that plaintiff's past work as an auto sprayer was

classified as skilled, medium work as performed.  (Tr. 82).  The ALJ asked Ms. Crawford about

the employment opportunities for a hypothetical person of plaintiff's age, education, and work

experience, who was limited to work at the light exertional level; who could occasionally climb

ramps and stairs; and could occasionally balance, stoop, kneel, crouch, and crawl.  The individual

could not have concentrated exposure to extreme temperatures, humidity, pulmonary irritants, or

unprotected heights.  The individual was able to perform simple, routine tasks, with only minimal

changes to job settings and duties, and no contact with the general public and only occasional

contact with coworkers and supervisors.  Ms. Crawford stated that such an individual could not

perform plaintiff's past work.  (Tr. 82-83).  There were, however, other jobs available in the

national economy at the unskilled level, including marker, production assembler, and injection

molding machine tender.  Reducing the individual to sedentary work eliminated these jobs, but

other work was available, including addresser, lens inserter and final assembler.  (Tr. 83-84).  In

response to questions from plaintiff's counsel, Ms. Crawford stated that off-task behavior

exceeding 15 percent of the workday and more than two absences per month would preclude

employment.  (Tr. 84-85).  Ms. Crawford stated that her testimony was consistent with the

Dictionary of Occupational Titles (DOT), with the exception of information regarding social

interaction, time off-task, and absences, which the DOT did not address.  Her testimony on these

limitations was based on her "professional experience and opinion."  (Tr. 84).


### D.    Medical Evidence

The administrative transcript begins with records from plaintiff's long-time primary care

physician John Garcia, M.D.,[6] on August 11, 2015, and concludes with an MRI of the lumbar spine

on May 14, 2019.  (Tr. 980, 1483-85).  During this time, plaintiff also received treatment from

cardiologist Jeffrey Brown, D.O., psychiatrist Sridevi Gavirneni, M.D.,[7] pulmonologist Umer

Hafeez Siddiqui, M.D., and gastroenterologist Leslie Tucker, M.D.  Plaintiff was hospitalized

between June 23 and July 15, 2017, after he experienced severe shortness of breath that was

determined to be linked to severe multivessel coronary artery disease.    (Tr. 513, 408).  He

underwent quadruple coronary artery bypass grafting (CABG) on July 3, 2017.  (Tr. 447-48).  He

was hospitalized again in November 2017 to treat a nonbleeding esophageal ulcer.  (Tr. 1453-55).

Throughout this entire period, Dr. Garcia prescribed Norco 10/325 mg to be taken 4 times each

day.[8]

---

[6] Dr. Garcia was named as plaintiff's primary care physician in the September 2012 ALJ decision.  (Tr. 96).

[7] According to the 2016 ALJ decision, plaintiff began psychiatric treatment in April 2014.  (Tr. 126).  He was prescribed Latuda, Abilify, Trazodone, and Buspar.  He was also prescribed Adderall for ADHD, but that medication was discontinued.  (Tr. 128).

[8] Dr. Garcia's records do not state why plaintiff was prescribed Norco.  In November 2015, his diagnoses included CPS (chronic or central pain syndrome) and headaches.  (Tr. 990).  At that time, he complained that he was having three migraine headaches a day, which he attributed to his new antidepressant

The Court summarizes the medical records for treatment preceding plaintiff's alleged onset date of September 27, 2016.  In early September 2015, plaintiff received emergency treatment for coughing and shortness of breath.  He felt better after being treated with antibiotics, prednisone, and a decongestant.  (Tr. 991).  In November 2015, he started taking Fetzima for depression.  (Tr. 989-90).  In June 2016, he reported temporary blindness in his right eye.  (Tr. 984).  A CT scan of the head showed no acute intracranial process and a carotid doppler showed bilateral mild atherosclerosis in the internal carotid artery.  (Tr. 900-02, 1012).  Pulmonary function tests in August 2016 disclosed severe obstructive ventilatory impairment with significant response to bronchodilators, air trapping, hyperinflation, and moderate decrease in DLCO.[9]

In October 2016, plaintiff complained of knee and back pain.  In November 2016, plaintiff saw psychiatrist Dr. Gavirneni for medication management of Bipolar II Disorder.  (Tr. 939-41).  Plaintiff reported that he was periodically depressed and had multiple crying spells on some days.  He was also more tired and forgetful.  On mental status examination, plaintiff made average eye contact, and was cooperative and fully oriented.  His mood was depressed and anxious and his affect was anxious.  His speech was clear; his cognition, perception, thought content, memory, insight, and judgment were all within normal limits; and his thought processes were logical.[10]  Dr.

---

medication.  (Tr. 990).  In March 2016, he complained of back pain, but not headache.  (Tr. 987).  In May 2016, it was noted that plaintiff complained of "the usual headaches."  (Tr.  985).

[9] DLCO is a measurement of the diffusing capacity of the lungs for carbon monoxide.  P. Enright, M.D., "Office-based DLCO tests help pulmonologists to make important clinical decisions,"  Respir Investig. (Sep. 2016) DLCO (last visited June 1, 2021).

[10] There are eight more medication management appointments documented in the record.  (Tr. 934-38, 959-63, 954-58, 948-53, 942-47, 1041-46, 1037-40, 1033-36).  At the third office visit, Dr. Gavirneni downgraded his assessment of plaintiff's judgment and insight to fair, where it remained in the following sessions.  (Tr. 961).  Otherwise, the mental status examinations remained consistent across all visits. Plaintiff saw Dr. Gavirneni only two times in 2018 — once in April and once in October — by which time he had been without his medications for six weeks.  (Tr. 1037).  Dr. Gavirneni assigned Global Assessment of Functioning scores of 40 and 48, consistent with serious limitations in functioning.

Gavirneni increased plaintiff's dosage of Abilify and continued Lamictal and Latuda[11] at their prior doses.  Although plaintiff was scheduled to return in six weeks, the next documented contact did not occur until late February 2017.

Plaintiff sought emergency treatment on January 23, 2017, for respiratory distress and a headache that he rated at pain level 8 on a 10-point scale.  (Tr. 319-20, 565-70).  His condition improved following treatment with a nebulizer, an antitussive, and the antianxiety Ativan.  He was diagnosed with COPD exacerbation and prescribed cough medicine, prednisone, and an antibiotic. He still had trouble breathing in late February 2017.  (Tr. 978).

Plaintiff returned to see Dr. Gavirneni on February 24, 2017.  (Tr. 934-38).  He reported experiencing mood swings with depression but no anxiety.  He also felt like people were watching him.  On mental status examination, plaintiff's affect was anxious and his mood depressed; his judgment and insight were fair.  Dr. Gavirneni increased the Abilify and discontinued Latuda.  In May 2017, Dr. Gavirneni prescribed Zoloft, in addition to Lamictal and Abilify.  (Tr. 959-63).  On June 16, 2017, Dr. Gavirneni noted that plaintiff still had anxiety and depression, with some mood swings and anger issues.  (Tr. 954-58).  Dr. Gavirneni increased the dosage of Zoloft and continued the Lamictal and Abilify.   In August 2017, Dr. Gavirneni increased the Zoloft again.  (Tr. 948-53).

On June 23, 2017, plaintiff sought treatment at SSM Mercy – Washington for sudden onset shortness of breath and was hospitalized with COPD exacerbation and severe lactic acidosis.  (Tr. 408-12).  A cardiac catheterization disclosed severe coronary artery disease, and he was transferred

---

[11] Abilify and Latuda are atypical antipsychotics used to treat mania and depression, respectively, in patients with bipolar disorder.  See  Abilify - medlineplusgov and Latuda - medlineplus.gov (last visited June 1, 2021).  Lamictal is an anticonvulsant that is used to increase the time between abnormal moods in patients with bipolar disorder.  See Lamictal - medlineplus.gov

to SSM Mercy — St. Louis to await a coronary artery bypass and graft procedure. (Tr. 409). He was extremely anxious and slept in his shoes and pants because he wanted to be ready to leave if necessary.[12] (Tr. 539). The bypass procedure was performed on July 3, 2017. In the days following surgery, plaintiff had difficulty participating in physical therapy due to shortness of breath attributable to anxiety. (Tr. 462-63, 469). He was assessed with decreased functional mobility and impaired strength and balance. His lung fields remained coarse and he required aggressive pulmonary hygiene. (Tr. 469). He was discharged on July 10, 2017 (Tr. 503-11), but was readmitted the following day with shortness of breath, gross edema, and jugular vein distension. (Tr. 336-402). Imaging studies showed diminished left ventricle activity, pulmonary infections, and elevation of the right hemidiaphragm. He was discharged again on July 15, 2017, with home-health nursing care and prescriptions for inhalers, delayed-release aspirin, Lasix, Lipitor, Coreg, Percocet, potassium-chloride, Nicoderm patches,[13] Oxycodone-acetaminophen, potassium, and Ativan, in addition to Abilify, Lamictal, and Zoloft. (Tr. 323-36, 398-400). His blood pressure medication was gradually increased. (Tr. 917).

On July 25, 2017, radiologist Jeffrey Brown, D.O., started monitoring plaintiff's coronary artery disease, hypertension, and hyperlipidemia. (Tr. 332-34). Dr. Brown noted that plaintiff would need to be on low-dose aspirin for life. He was prescribed Losartan, Lipitor, and Coreg to manage his coronary artery disease, hypertension, and hyperlipidemia. Plaintiff was instructed on the importance of not smoking and reducing his sodium intake. (Tr. 331). On August 1, 2017, the home health nurse notified Dr. Brown that plaintiff's blood pressure was high and that he was drinking 48 ounces of soda per day, which could be contributing. (Tr. 331). On August 2, 2017,

---

[12] The nurse reported that plaintiff would not take off his pants and shoes, even to sleep, either in the hospital or at home. (Tr. 539).
[13] Plaintiff testified that he stopped smoking the day of his heart attack. (tr. 81).

it was noted that plaintiff planned to begin cardiac rehabilitation and remained off tobacco.  On August 25, 2017, Dr. Brown stated that plaintiff was doing well from a cardiovascular standpoint. (Tr. 321-23).

Pulmonologist and sleep specialist Umer H. Siddiqui. M.D., began following plaintiff on August 7, 2017.  (Tr. 325-28).  Plaintiff reported that his shortness of breath had improved.  A physical examination was unremarkable, with the exception of elevated blood pressure.  Dr. Siddiqui assessed plaintiff with severe COPD, pulmonary nodules, and snoring with excessive daytime sleepiness.  He required pulmonary function testing — to be completed once he fully recovered from chest surgery — and a sleep study.  A CT scan of the chest showed that his earlier ground glass opacities and bilateral effusions had resolved.  (Tr. 576-77).  It also showed mild underlying emphysema and atherosclerotic calcifications of the coronary arteries and aortic arch. At a check of his surgical incisions on August 10, 2017, plaintiff was noted to be engaging in normal activities of daily living and sleeping well.  (Tr. 324).  Findings from the physical examination were unremarkable and his incisions were healing well.

On September 29, 2017, Dr. Gavirneni noted that plaintiff had gained weight after he stopped smoking 5 months earlier.  (Tr. 942-47).  He had some anxiety and depression, but no psychosis and was tolerating his medications well.  His medication regimen was unchanged.

On October 17, 2017, plaintiff told Dr. Garcia that he could not breathe well.  (Tr. 974). Dr. Garcia directed him to follow up with Dr. Brown and the cardiothoracic surgeon that performed the CABG procedure.

On November 21, 2017, Dr. Siddiqui noted that plaintiff had increased shortness of breath, wheezing, and had begun to cough up blood and pass blood in his stool.  (Tr. 1050-68).  A chest x-ray showed no active pulmonary disease.  (Tr. 1169).  That same day, gastroenterologist Leslie

Tucker, M.D., performed an upper GI endoscopy, which disclosed LA Grade D reflux esophagitis and non-bleeding esophageal ulcer.[14]  (Tr. 1453-55).  Plaintiff was hospitalized for treatment with an IV proton pump inhibitor.  At follow-up in December 2017, plaintiff complained of severe esophagitis and was diagnosed with acute esophageal ulcer with hemorrhage.  (Tr. 1413-26).  An upper GI endoscopy on January 3, 2018, disclosed a hiatal hernia and short-segment Barrett's esophagus, with mild to moderate inflammation and without evidence of dysplasia or malignancy. (Tr. 1450, 1456).

On January 8, 2018, Dr. Brown noted that plaintiff had lower leg edema and increasing shortness of breath.  (Tr. 1206).  Dr. Brown prescribed Lasix and ordered an echocardiogram, which showed mild tricuspid regurgitation.  (Tr. 1205, 1381-82).  On February 26, 2018, Dr. Brown noted that plaintiff's beathing had improved and that he was doing relatively well from a cardiovascular standpoint.  His edema had resolved.   (Tr. 1249, 1251).

Pulmonary function tests performed on March 8, 2018, showed severe obstructive ventilatory defect with significant postbronchodilator improvement, evidence of air trapping, moderate impairment in gas exchange, no significant desaturation at rest or with activity, and a significant decrease in lung capacity since his prior testing.  (Tr. 1154-61).  It was noted that plaintiff's knees, hips, and back hurt and that he had to be encouraged to walk faster.  (Tr. 1160). On March 29, 2018, Dr. Garcia noted that plaintiff had a headache and bilateral knee pain and that his blood pressure was elevated, possibly because he had not taken his medication that morning. (Tr. 1465).  Plaintiff had begun physical therapy.

---

[14] "The Los Angeles (LA) grade of reflux esophagitis (A to D) is assumed to reflect severity of the underlying GERD. Thus, LA-D esophagitis patients might be expected to have the most conditions predisposing to GERD (e.g. obesity, hiatal hernia), and the highest frequency of GERD symptoms."  LA Grade D esophagitis (last visited June 7, 2021).

In April 2018, Dr. Gavirneni noted that plaintiff had some anger, more depression, and baseline paranoia. He was isolating and crying off and on. (Tr. 1041-46). Plaintiff described his mood as "feeling not good" and his affect was anxious and depressed. Plaintiff's dosage of Zoloft was increased.

In June 2018, Dr. Brown noted that plaintiff was experiencing increased shortness of breath with activity and chest pressure, similar to what he experienced before his bypass surgery. (Tr. 1262-84). He did not have palpitations or syncopal episodes. A nuclear stress test showed no ischemia. Hs triglycerides were elevated and Dr. Brown warned plaintiff to watch his diet. On July 24, 2018, Dr. Garcia noted that plaintiff had difficulty breathing and that his shortness of breath was increasing, even with walking short distances. He was using his nebulizer three times a day and albuterol three to five times a day. He had bilateral edema. (Tr. 1463). On September 28, 2018, a blood indicator of heart failure was normal and his comprehensive metabolic panel was stable. (Tr. 1373). On October 5, 2018, Dr. Brown noted that plaintiff's edema improved with Lasix and opined that the edema was related to plaintiff's consumption of "a lot of fast food" and high sodium intake. (Tr. 1313). Plaintiff reported that his shortness of breath remained unchanged. (Tr. 1308). That same day, Dr. Garcia noted that plaintiff's back and knees were getting worse. (Tr. 1462). On October 26, 2018, plaintiff told Dr. Gavirneni that he had been doing well on his medications but had run out six weeks earlier. Dr. Gavirneni decreased plaintiff's Zoloft and started him on Cymbalta.

On December 12, 2018, Dr. Siddiqui noted that plaintiff had wheezing with fatigue and shortness of breath with exertion. (Tr. 1138). His COPD and shortness of breath were both

13

improved with medication.   He still had not had a sleep study.[15]  (Tr. 1142).  An EKG completed on January 4, 2019, showed sinus rhythm with low voltage and nonspecific wave changes, similar to results obtained on December 1, 2017.  (Tr. 1339, 1185).  Dr. Brown prescribed Imdur to treat chest pain.  (Tr. 1333).  On December 14, 2019, plaintiff told Dr. Garcia that his back pain was improving.  (Tr. 1461).

On January 15, 2019, gastroenterologist Dr. Tucker noted that plaintiff had separation of the abdominal muscles.  (Tr. 1438).  She directed him to take Protonix twice a day for two weeks and then reduce to once a day indefinitely. She also made dietary recommendations to address GERD symptoms and weight loss.  She noted that his conditions were exacerbated by his psychiatric disease.  (Tr. 1434).  On January 18, 2019, plaintiff told Dr. Gavirneni that his depression was worse and he was feeling anxiety.  (Tr. 1033-67).  Dr. Gavirneni decreased plaintiff's dosage of Zoloft and started him on Cymbalta; he continued Abilify and Lamictal.

On February 26, 2019, plaintiff told Dr. Garcia that his breathing was getting worse and that his knee pain had increased, while his back pain was "largely unchanged or reasonably controlled" on medication.  (Tr. 1460).  In April 2019, x-rays of the knees showed some chondrocalcinosis[16] of the right knee but no joint effusion or acute findings; the left knee was unremarkable.  (Tr. 3-4).  X-rays of the lumbar spine showed mild degenerative changes with no acute bony abnormality.  (Tr. 1485).

---

[15] Plaintiff testified at his hearing that he had not had a sleep study done because his wife had been unable to take the time off work to stay with him overnight.  (Tr. 75).

[16] Chondrocalcinosis "is a rheumatic disease characterized by the excessive accumulation of calcium crystals in the cartilage of joints.  The knee is the area that is most often affected by this disease, although it is also common in other joints and bone areas.  It also typically occurs more in older people." chondrocalcinosis (last visited July 11, 2021).  Although the condition does not normally cause any symptoms, some patients may experience osteoarthritis, "pseudogout" arthritis, or symptoms similar to rheumatoid arthritis.  Id.

On May 6, 2019, plaintiff went to an emergency room with complaints of sudden onset of sharp, stabbing back pain while he was bending over using a drill.  (Tr. 28).  The pain radiated to his left foot and was made worse by movement.  Treatment with muscle relaxants and narcotics had not helped.  On examination, plaintiff did not appear ill or to be in distress.  He sat calmly on the examination table.  He exhibited decreased range of motion of the lumbar spine, tenderness, bony tenderness, and pain.  He did not have edema or spasm.  He had normal strength and gait and had no cranial nerve or sensory deficit.  He had a score of 6 on the Glasgow Coma Scale motor subscale.[17]  His mood, affect, speech, behavior, cognition, and memory were all normal.  (Tr. 31).  He was treated with Dilaudid, Toradol, and Valium, and reported improvement in his symptoms.

A renal ultrasound on May 10, 2019, suggested possible bilateral stenosis, but the image quality was limited.  (Tr. 6).  Further imaging was recommended.

Plaintiff underwent an MRI of the lumbar spine on May 14, 2019.  (Tr. 1483-84).  The alignment of the vertebral bodies was normal and vertebral heights and disc spaces were well-preserved.  The distal spinal cord and paravertebral tissues were normal.  The discs from T12 through L3 were normal without stenosis.  At L3-L4, there was mild foraminal stenosis.  At L4-L5, there was a mild generalized bulging disc with a large left paracentral disc extrusion with a sequestered disc fragment.  There was severe left lateral recess stenosis and likely compression of the left L5 nerve root.  In addition, there was possible compression of the left L4 nerve root with mild foraminal stenosis.  Finally, there was severe central spinal canal stenosis.  On May 15, 2019, Dr. Garcia referred plaintiff to neurosurgery.  (Tr. 1484).  This is the final entry in the medical record.

---

[17] "The Glasgow Coma Scale (GCS) . . . is a clinical scale to assess a patient's 'depth and duration of impaired consciousness and coma' following an acute brain injury." Glasgow Coma Scale (last visited June 11, 2021).  A score of 6 on the motor subscale is the highest score that can be achieved and indicates that the patient obeys commands for movement.  GCS_CDC (last visited June 11, 2021).

E.    **Opinion Evidence**

On November 7, 2017, primary care physician Dr. Garcia completed a statement for the state agency, writing only that plaintiff was "able to perform nonstrenuous work-related activities." (Tr. 972).

On December 18, 2017, Kirk Boyenga, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment based on a review of the records.  (Tr. 153-54, 158-60).  Dr. Boyenga found that plaintiff had medically determinable impairments in the category of 12.04 (depressive, bipolar and related disorders).  Dr. Boyenga listed plaintiff's symptoms as weakness, fatigue, sustained concentration and persistence limitations, social interaction limitations, and shortness of breath.  He stated that plaintiff's statements regarding symptoms was fully consistent with evidence in the file.  He wrote that plaintiff could understand complex four-step instructions but could only recall a span of three-step commands.  He had "sufficient mental capacity to concentrate on, understand, and remember unchanging less-than-four-step instructions," but would be impaired for detailed or complex instructions.  Furthermore, plaintiff would function best in a setting where there was little need for direct supervision or frequent interactions with coworkers and members of the public.  Finally, he was capable of adapting to changes that were predictable and introduced gradually.  The ALJ found Dr. Boyenga's assessment persuasive.  (Tr. 59).

Harry Cole, M.D., completed a physical residual functional capacity assessment based on review of the records.  (Tr. 155-58).  Dr. Cole opined that plaintiff could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; sit and stand/walk about 6 hours in an 8-hour day; and use hand or foot controls without limitation within the designated weight restrictions.  Plaintiff's COPD and shortness of breath limited him to frequent use of ramps, stairs,

ladders, ropes, and scaffolds but he had no other postural limitations.  He should avoid concentrated exposure to respiratory hazards but otherwise had no environmental limitations.  The ALJ found Dr. Cole's assessment persuasive "except for the fact that it was completed prior to diagnostic studies showing severe degenerative disc disease" which limited him to sedentary work.  (Tr. 59).

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920(a); Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from

17

a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564

F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity

(RFC), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523

(citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return

to his past relevant work, "compar[ing] [the claimant's] [RFC] . . . with the physical and mental

demands of the [claimant's] past relevant work."  20 C.F.R. § 404.920(f).  The burden at step four

remains with the claimant to prove his RFC and establish that he cannot return to his past relevant

work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006);

Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a

claimant cannot return to past relevant work, the burden shifts at step five to the Administration to

establish that the claimant maintains the RFC to perform a significant number of jobs within the

national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. §

416.960(c).

The Court's role on judicial review is to determine whether the ALJ's finding are supported

by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary

sufficiency is not high."   Id.   Stated another way, substantial evidence is "less than a

preponderance, but enough that a reasonable mind might accept it as adequate to support a

decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue,

964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the

Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue,

495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 48-62). The ALJ found that plaintiff had not engaged in substantial gainful activity since October 11, 2017, the application date. (Tr. 51). At step two, the ALJ found that plaintiff had the severe impairments of COPD, coronary artery disease, hypertension, headaches, obesity, degenerative disc disease, anxiety disorder, and mood disorder. The ALJ concluded that plaintiff's

19

GERD and ulcer were not severe because they had been successfully treated and there was no evidence that they caused more than minimal work-related limits for twelve months.  (Tr. 51).  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, including listings 1.04 (disorders of the spine), 3.02 (chronic respiratory disorders), any of the listings in section 4.00 (cardiovascular system), 12.04 (depressive, bipolar and related disorders), or 12.06 (anxiety and obsessive–compulsive disorders).  (Tr. 52-53).  Plaintiff does not challenge the ALJ's assessment of his severe impairments.

The ALJ next determined that plaintiff had the RFC to perform sedentary work, except that he could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl.  He had to avoid concentrated exposure to environmental hazards and all exposure to moving machinery and unprotected heights.  In addition, he was limited to simple, routine tasks with only minimal changes in job setting and duties.  He must avoid all contact with the general public and have only occasional contact with coworkers and supervisors.  (Tr. 53).  In assessing plaintiff's RFC, the ALJ summarized the medical record; opinion evidence; plaintiff's wife's report; as well as plaintiff's written reports and testimony regarding his abilities, conditions, and activities of daily living.  (Tr. 53-60).  The ALJ found that plaintiff's coronary artery disease, COPD, and esophagitis improved with treatment.  (Tr. 57-58).  In addition, the ALJ found, there was not evidence that plaintiff's headaches, obesity, musculoskeletal complaints, and psychiatric disorders resulted in significant functional limitations, for twelve months in duration and despite strict compliance with prescribed treatment.  (Tr. 58-59).  The ALJ also noted that there was no evidence that plaintiff was ever refused treatment or medication based on an inability to pay.  (Tr. 59-60).  Finally, the ALJ rejected

plaintiff's contention that his medication caused side effects, noting that no persistent and adverse side effects were documented in the record. Indeed, the ALJ found, plaintiff was often not compliant with his medication and treatment recommendations and that his impairments were controlled when he did comply. (Tr. 60). In summary, the ALJ found that, while plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, his statements regarding the intensity, persistence, and limiting effect of his symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 60).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work. On the date of the application, plaintiff was a younger individual. He had a limited education and was able to communicate in English. The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not he had transferable skills. The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in significant numbers in the national economy, including addresser, lens inserter, and final assembler. (Tr. 60-61). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act since October 11, 2017, the date the application was filed. (Tr. 61).

## V.  Discussion

Plaintiff argues that the ALJ failed to fully and fairly develop the record, specifically with respect to the impact of severe spinal stenosis on his RFC and the ability to function in the workplace. He argues that the matter must be remanded for further evaluation.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

21

mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 (July 2, 1996).  As the Eighth Circuit recently stated, "the RFC determination is a 'medical question,' that must be supported by some medical evidence of [plaintiff's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (citations omitted).  "But, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." Id. (citation and parenthetical omitted).  "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner, . . . based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." Id. at 744-45 (citations omitted).  "Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints.  Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity, persistence, and limiting effects of symptoms." Id. at 745 (footnote and citations omitted).  Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence.  Id. (footnote, citation, and parenthetical omitted).  Ultimately, the claimant is responsible for providing evidence relating to his or her RFC and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." Turner v. Saul, No. 4:18 CV 1230 ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

Plaintiff argues that the ALJ was required to obtain a medical opinion to assess the severe spinal stenosis found in the May 2019 MRI and its impact on his RFC.  Further, he argues, the

ALJ "succumbed to the temptation to play doctor" and made "independent medical findings" in lieu of obtaining an opinion from a medical professional.  Pl. Brief at 5 [Doc. # 25].  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).  Contrary to plaintiff's suggestion, however, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all.  See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions).  Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  And, while the ALJ "has a duty to fully and fairly develop the evidentiary record," the ALJ is required "to order medical examinations and tests only if the medical records presented to [her] do not give sufficient medical evidence to determine whether the claimant is disabled."  Beatty v. Saul, No. 2:18 CV 22 ACL, 2019 WL 4243087, at *10 (E.D. Mo. Sept. 6, 2019) (quoting Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012), and McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  Where other evidence in the record provides a sufficient basis for an ALJ's decision, then an ALJ "is permitted to issue a decision without obtaining additional medical evidence."  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (internal quotation marks and citation omitted).  As reviewed below, the medical record provides a substantial basis for the RFC and the ALJ was not required to obtain additional evidence.

The ALJ addressed the results of the May 2019 MRI of the lumbar spine in a paragraph summarizing the medical records:

> The medical records do not completely support the claimant's allegations. . . . [An] MRI of his lumbar spine taken on May 14, 2019, showed large left paracentral disc extrusion with a sequestered disc fragment causing narrowing of the left foramen around the exiting left L4 nerve root and severe stenosis of the left lateral recess with likely compression of the L5 nerve root. However, the claimant had not gone to the hospital as advised and he continued to smoke cigarettes. Furthermore, a large part of the records from Dr. Garcia are medication refill requests and not actual office visits. Examination findings were essentially normal. The acute illnesses resolved with treatment and were not ongoing for twelve months. The claimant reported his pain was controlled with his current pain medication.

(Tr. 55).

Plaintiff argues that the ALJ improperly relied on his failure to go "to the hospital as advised" because this occurred in February 2017, several months before his alleged disability onset date of October 11, 2017. His failure to quit smoking was similarly dated, because the record establishes that he quit smoking after his heart attack in July 2017. The Court agrees with plaintiff that these two factors would not provide a basis for evaluating the impact of severe spinal stenosis on his RFC. But the ALJ's statement was made in the context of a paragraph evaluating the degree to which the medical records supported plaintiff's allegations regarding all of his conditions. (Tr. 55 ("The medical records do not completely support the claimant's allegations.")). And, in that context, the ALJ's observation that plaintiff did not fully comply with treatment recommendations is appropriate. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) (plaintiff's failure to follow treatment recommendations valid reason to discredit subjective complaints).

Plaintiff argues that the evidence does not support the ALJ's conclusion that his pain was adequately controlled by medication. Pl. Brief at 5 (citing Tr. 55). Defendant argues that any error the ALJ made with respect to the efficacy of his pain medication was harmless. An error is harmless when the claimant fails to "provide some indication that the ALJ would have decided

differently if the error had not occurred."  Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012).  The

ALJ summarized the objective evidence relevant to functional limitations arising from plaintiff's

spine condition as follows:

> Objective medical findings by the treating physicians did not include significant
> deficits in strength, neurological function, range of motion, posture, sensation,
> reflexes, pulses or gait, lasting twelve months in duration.  Objective medical
> findings by treating physicians did not include significant deficits in the claimant's
> abilities to squat, stand, walk, sit, lift, carry, bend or stoop, lasting twelve months
> in duration.  The objective medical findings within the treatment notes do not
> include long term significant atrophy or spasm.  There is no medical evidence that
> the claimant was prescribed, or determined to require, the prolonged use of an
> assistive device such as a cane or brace for the purpose of ambulation, motion, or
> immobilization, for twelve consecutive months, since the alleged onset date.  There
> is no medical evidence that the claimant has sought treatment on a regular basis
> through a work hardening program or a pain clinic.  The claimant was not
> frequently reported to be in acute distress.

(Tr. 59).  Thus, the ALJ examined the longitudinal record; noted the absence of objective findings,

limitations, and specialist treatment; and concluded that plaintiff's pain was adequately

accommodated by limiting him to sedentary work.  Furthermore, plaintiff's lumbar spine was

examined one week before the May 2019 MRI.  At that time, he had decreased range of motion,

tenderness, and pain, but no swelling, edema, or spasms.  In addition, he had normal strength and

gait, and no cranial nerve or sensory deficits.  His symptoms improved after treatment with pain

medication and he was discharged without restrictions.  (Tr. 32).  Finally, the ALJ took the MRI

findings into account when limiting plaintiff to sedentary level work.  (Tr. 59) (noting that state

agency doctor's assessment that plaintiff could perform light work was made before 2019 MRI

which limited plaintiff to sedentary work).  The Court agrees with defendant that plaintiff has

failed to show that any error the ALJ made in assessing the efficacy of his pain medication would

have altered the outcome and thus was harmless.

After reviewing the entire record, the ALJ concluded that plaintiff could perform work while seating with occasional standing or walking.  Plaintiff does not identify additional limitations supported by the MRI or any other evidence in the record that the ALJ failed to consider.  Other evidence in the record provides a sufficient basis for the ALJ's decision and the ALJ was not required to obtain additional evidence before issuing the decision in this case.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of July, 2021.